No. 59,850

ROBERT SMELKO III, a minor, by and through Robert R. Smelko II, his father, and Rebecca A. Smelko, his mother, both natural guardians and next friends, and ROBERT R. SMELKO II, and REBECCA A. SMELKO, individually, *Plaintiffs-Appellees,* v. E. HOLMES BRINTON, M.D.; CELESTE A. GENILO, M.D.; and MINOR SURGERY CENTER OF WICHITA, INC., a corporation, *Defendants-Appellants.*

(740 P.2d 591)

Opinion filed July 17, 1987.

*Leonard R. Frischer,* of Turner and Boisseau, Chartered, of Wichita, argued the cause, and *Eldon L. Boisseau,* of the same firm, was with him on the briefs for the defendants-appellants.

*Arden J. Bradshaw,* of Post, Syrios & Bradshaw, of Wichita, argued the cause, and *Bradley Post,* of the same firm, was with him on the brief for the plaintiffs-appellees.

The opinion of the court was delivered by

MILLER, J. This is a medical malpractice action. Robert Smelko III, a three-month-old child, sustained second- and third-degree

burns from a heating pad on which he was placed during surgery for repair of an inguinal hernia. Plaintiffs are the minor child (Bobby) and his parents, Robert Smelko II and Rebecca Smelko. Defendants are E. Holmes Brinton, M.D., the surgeon; Celeste Genilo, M.D., the anesthesiologist; and Minor Surgery Center of Wichita, Inc., where the surgery was performed. Shortly before trial, defendants admitted liability and the case went to trial before a jury in Sedgwick County District Court on the issue of damages. The jury returned a verdict for the minor plaintiff in the sum of $400,000 and for the parents for $2,250. The defendants and the parents appeal.

Defendants contend that the trial court erred in receiving into evidence the heating pad which caused the burns and an enlargement of the warning attached to the pad, in permitting the parents to recover for losses incidental to their son's injury, and in denying defendants' motion for a new trial; that plaintiffs' closing argument was improper and prejudicial; and that the verdict was excessive and a product of passion and prejudice. The parents, by cross-appeal, contend that the trial court erred in holding that they could not recover for their emotional distress.

The facts are not disputed. In January 1984, when Bobby Smelko was about three months old, the family doctor, Cathy Woodring, M.D., diagnosed a right inguinal hernia and recommended that it be surgically corrected. She referred the Smelkos to a surgeon, E. Holmes Brinton, M.D. Dr. Brinton confirmed Dr. Woodring's diagnosis. Surgery was scheduled for January 17, 1984, at the Minor Surgery Center in Wichita.

Bobby was admitted to the Minor Surgery Center at 6:26 a.m. Dr. Brinton arrived at 7:15. The anesthesia was started at about 7:40 and continued until 8:50. Bobby's parents were in the waiting room during the surgery. When the surgery was completed, Dr. Brinton informed the parents that it had been successful. At about 9:10 a.m., the parents were informed that Bobby was awake in the recovery room and they could go and see him. They heard Bobby screaming as soon as they entered the recovery room. He continued to scream despite his mother's continuous efforts to calm him. The nurses told the parents that crying was normal after surgery and that they could take him home. Mrs. Smelko testified that Bobby wasn't just crying, he was screaming.

Bobby screamed all the way home and continued to scream at home despite repeated efforts to calm him. Finally, even though his diaper was dry, his mother decided to change it, thinking it may have been too tight over the stitches. When she removed the diaper, she discovered large blisters on his buttocks which were discharging blood and water. The parents immediately called the Minor Surgery Center, and were told to contact Dr. Brinton. At about 1:30 or 2:00 p.m., Dr. Brinton examined Bobby, and instructed the parents to take him to Wesley Medical Center. Bobby was admitted to the hospital about 3:00 p.m., where he was examined and treated by Dr. Tobin, a resident physician. Bobby had deep second- and third-degree burns covering 75% of the left and 90% of the right buttocks.

The burns were apparently caused by a heating pad which was placed under Bobby during the hernia surgery to keep him warm. The Center owned two heating pads, which were identical, and one of the two was used during the surgery. The pad was set up by the circulating nurse in the operating room at the request of the anesthesiologist, Dr. Celeste Genilo. The nurse who diapered Bobby in the operating room after the surgery didn't notice anything unusual about his buttocks. The third-degree burns, however, were coagulation type burns. The prolonged exposure to the heat caused clotting in the veins and arteries so that oxygen could not pass. The cells then died over a period of time. The death of the cells would not be noticeable for three to four hours after exposure to the heat.

After Bobby was admitted to the hospital, Dr. Tobin ordered six milligrams of Demerol to be administered every three hours as needed for pain; Betadine soaks three to four times daily, or with each diaper change, whichever was more frequent; and application of Silvadine ointment following the Betadine soaks. Demerol is a narcotic pain reliever, and Betadine is an iodine solution.

On January 23, Norman K. Pullman, M.D., a plastic surgeon, was brought into the case. He determined that, because most of the burns were third-degree burns, they would require grafting at a later date. The graft was postponed to allow the second-degree burns to begin to heal. Dr. Pullman recommended that the

burned area be left uncovered to promote healing and decrease the risk of infection, and he recommended continuation of the Betadine baths. Around January 25, a less potent drug, Phenergan, a sedative, was substituted for the Demerol for pain management.

The skin graft was performed on February 1, and Dr. Pullman termed it a success. The top layer and part of the second layer of the skin from Bobby's back, adjacent to the burn area, were utilized in the graft. The Betadine and ointment treatments continued after the graft, and Phenergan and Tylenol were prescribed for pain. Bobby was finally released from the hospital on February 23, 1984.

Bobby's mother stayed with him at the hospital throughout his stay, going home only about ten times during the five-week period. Bobby's father stayed as much as his work would permit, approximately fourteen hours every day. The parents administered the Betadine baths whenever they were there. His mother testified that Bobby screamed during each bath and would try "to get away" whenever he saw the green tub containing the Betadine solution. Dr. Pullman testified that burns are painful injuries and verified that even a three-month-old infant is capable of feeling pain. He also testified that second-degree burns are particularly painful because nerve endings are exposed; the more serious third-degree burns are less painful because the nerve endings have been destroyed.

Betadine swabs were still required after Bobby's release from the hospital and he could not wear a diaper for the next month. Even after he could wear diapers, Mrs. Smelko had to change him within ten to fifteen minutes after each urination or bowel movement, or his buttocks would get raw and red. This continued for over a year. She also continued to apply A & D Ointment to the area to keep the skin from drying out, and was still using it at the time of trial.

Dr. Pullman continued to see Bobby until October 17, 1985, when he determined that the grafts were soft and pliable, and nothing further could be done. The scars are permanent, and will grow proportionately to Bobby's body. The grafted skin is less resistant to normal wear and tear than normal tissue; there is no oil or sweat secretion, and it will be dryer and less elastic than

normal tissue. Given the location, the grafts will cause no specific limitations on Bobby's activities.

Defendants first contend that the trial court erred in admitting evidence on the issue of defendants' liability, since the defendants had admitted liability and the case was to be tried solely on the issue of damages. Specifically, they contend that the trial court erred in admitting into evidence the heating pad which caused Bobby's burns and an enlargement of a warning found on the heating pad. The warning said:

"GENUINE WET PROOF
THREE-HEAT
ELECTRIC HEATING PAD
WARNING
BURNS WILL RESULT FROM IMPROPER USE
NEVER USE PAD WITHOUT COVER IN PLACE
CAREFULLY EXAMINE BEFORE EACH USE
DISCARD THE PAD IF IT SHOWS ANY SIGN OF DETERIORATION (SUCH AS CHECKING, BLISTERING, OR CRACKING). FOLLOW INSTRUCTIONS ON BOX OR PACKED WITH PAD, CAUTION DO NOT USE ON AN INFANT, INVALID, OR A SLEEPING, OR UNCONSCIOUS PERSON. CHECK SKIN UNDER PAD FREQUENTLY TO AVOID BURNING. AVOID SITTING ON OR CRUSHING THIS PAD. TEMPERATURES SUFFICIENTLY HIGH TO CAUSE BURNS MAY OCCUR REGARDLESS OF CONTROL SETTING."

Prior to trial, defendants admitted liability and sought to exclude from evidence the heating pad and an enlargement of the warning as irrelevant to the issue of damages. The trial judge denied this motion, finding:

"I do believe that is has some materiality and relevance in demonstrating the extent and nature of the injury in terms of what a pad like this is inclined to do, and, therefore, the warning, I think, is consistent with that and a jury knowing that.

"Even though you have admitted liability, the very nature of how the injury occurred is inherent in the use of this particular pad and which goes to the extent and nature of the injury that can or has resulted. I think it is a part of it, and so I'm going to overrule your objection on that, too."

Defendants argue on appeal that the exhibits should have been excluded as irrelevant to the issue of damages. K.S.A. 60-401(b) defines relevant evidence as "evidence having any tendency in reason to prove any material fact." The determination of relevancy is "a matter of logic and experience, not a

matter of law." *McGuire v. Sifers*, 235 Kan. 368, 371, 681 P.2d 1025 (1984). The rules pertaining to a determination of relevancy are stated in *State v. Smith*, 225 Kan. 796, 801, 594 P.2d 218 (1979):

"Our court recently defined relevant evidence in *State v. Nicholson*, 225 Kan. 418, 420, 590 P.2d 1069 (1979), and cases cited therein. Rules from the cases provide: (1) relevancy does not necessarily mean the evidence bears directly on the case; (2) admissibility of the evidence rests largely within the discretion of the trial court; and (3) if the probative value of relevant evidence is outweighed by the danger the jury might be unduly prejudiced, it should be excluded."

Defendants rely on various authorities from other jurisdictions, most of which consist of rulings that evidence relevant *only* to the issue of liability and not relevant to damages is inadmissible when liability has been admitted. See, *e.g., Jones v. Carvell*, 641 P.2d 105 (Utah 1982); *Snyder v. General Electric Co.*, 47 Wash. 2d 60, 287 P.2d 108 (1955). This rule would allow the introduction of evidence which, although relevant to liability, is also relevant to the extent of damages.

While the defendants admitted liability, the admission contained no explanation or admission regarding how the injuries occurred. Although plaintiffs were relieved of establishing liability, we think the better rule is to permit a plaintiff to introduce reasonable evidence to show how the injury was sustained. The warning on the heating pad bears directly on the issue in the case—the nature and extent of the child's injuries. Dr. Pullman, the plastic surgeon, testified that he concluded the burns were caused by the heating pad. The warning on the heating pad served to corroborate his theory of the cause of the burns, and the source of the burns seems pertinent to the jury's assessment of the nature and extent of the injuries. Although the cause was described by Dr. Pullman, the warning would be helpful to the jury, which might well not realize that such an innocuous and commonplace device could cause such severe injuries. Here, two heating pads were admitted into evidence. One of the pads had been used during the surgery and caused the injury. Attached to each heating pad was the warning of which defendants now complain, although the warnings were faded and difficult to read. The blow-up simply provided the jury with an easily readable enlargement of the warning. Under the circumstances,

we conclude that the pads and the warning thereon are relevant to both liability and damages. The trial court did not commit prejudicial error by admitting the heating pads or the enlargement of the warning into evidence.

Defendants argue that plaintiffs' closing argument was improper and prejudicial, and denied defendants a right to a fair trial. They complain of two lines of commentary by plaintiffs' counsel during the rebuttal phase of the closing argument. Plaintiffs' counsel explained that the jury should separate counsel from the parties they represent—both plaintiffs' counsel and defendants' counsel. In response to defense counsel's statement during closing argument that Robert Smelko II consulted a lawyer shortly after the injury occurred, plaintiffs' counsel said, "He went to a lawyer fairly soon afterwards, and I think you can see why." These arguments were fairly responsive to defendants' closing argument, and do not constitute prejudicial or reversible error.

Finally, during the voir dire, defense counsel asked the jurors if they could recall anything that happened in their lifetime before the age of one. During closing argument, defendants' counsel argued that Bobby would not remember his injuries and that, arguably, pain not remembered was pain not suffered. In response, during the rebuttal argument, plaintiffs' counsel said, in effect, that Bobby was the one person involved who could not tell the jury about what happened to him. If Bobby could speak, he would tell the jurors of awakening from the surgery with searing pain he could not understand and of the nightmare that followed.

There was considerable evidence that Bobby was in pain immediately following the surgery. He was given regular doses of a powerful pain medication for an extended period of time. His mother testified regarding his screaming and his apparent fear of the Betadine baths. Dr. Pullman testified regarding the painfulness of burns and the capacity of a three-month-old infant to feel pain. Under the circumstances, we conclude that plaintiffs' rebuttal argument was not improper, and the trial court did not commit reversible error by denying a new trial on the basis of comments made by plaintiffs' counsel during closing argument.

Defendants contend that the trial court erred in permitting the

parents to recover for losses incidental to their son's injury. Defendants do not challenge the amount of that award or the sufficiency of the evidence to support it.

The parents, in the petition filed in this case, sought to recover damages for their emotional distress, and for medical expenses and other special damages. The pretrial order listed two of the issues as:

"(d) What is the nature and extent of plaintiff's alleged injuries and damages?

"(e) Are plaintiffs entitled to recover from defendants under any theory of liability, and, if so, what amount of damages are they entitled to recover?"

At trial, there was extensive evidence of the amount of time Rebecca Smelko spent at the hospital with her son, of the ten trips she made between the hospital and home during his hospitalization, and of the trips she made with Bobby to the hospital or to the physician's office following his discharge from the hospital.

In the petition, the parents sought damages for their emotional distress. Defendants filed a motion in limine seeking to suppress introduction of evidence as to the parents' emotional distress. The trial court sustained that motion and dismissed the parents' claim for emotional distress damages. Both the original petition and the pretrial order, however, appear to encompass the parents' claim for incidental damages arising out of their son's injuries. That issue was not taken out of the lawsuit by the trial court's ruling on the parents' claim for emotional distress. The trial court submitted a separate verdict for the damages sustained by the parents and the jury returned a verdict for $2,250 on their behalf. Defendants argue that this element of damages was not included in the pretrial order, and thus argue that it was error for the trial court to submit that issue to the jury. From a reading of the petition, the pretrial order, and the record in this case, we conclude that the matter was properly covered by the pretrial order and properly submitted to the jury for determination.

Defendants challenge the verdict—the jury award of $400,000 to Bobby—as excessive, and the product of passion and prejudice. Under the instructions given by the trial court, the jury could award Bobby:

"such amount of money as will reasonably compensate him for his injuries and

losses resulting from the occurrence in question including any of the following shown by the evidence:

"(a) Pain, suffering, disabilities, scarring or disfigurement, and any accompanying mental anguish suffered by plaintiff to date and those he is reasonably certain to experience in the future;

(b) The reasonable expense of necessary medical care, hospitalization and treatment received, and reasonable expense of necessary medical care, hospitalization and treatment reasonably certain to be needed in the future."

The evidence documented medical expenses to the time of trial at $13,476. Thus, the remainder of the award was for those items, past and future, listed under subparagraph (a)—pain, suffering, disability, scarring or disfigurement, and mental anguish. Defendants claim that this amount, approximately $385,000, is excessive for those claims.

We recently stated the appropriate standard of review in *Ratterree v. Bartlett*, 238 Kan. 11, 22, 707 P.2d 1063 (1985) (quoting *Cantrell v. R. D. Werner Co.*, 226 Kan. 681, 686, 602 P.2d 1326 [1979]):

" 'Where a charge of excessive verdict is based on passion or prejudice of the jury, but is supported solely by the size of the verdict the trial court will not be reversed for not ordering a new trial, and no remittitur will be ordered unless the amount of the verdict in light of the evidence shocks the conscience of the appellate court.' "

Defendants claim the verdict is excessive in light of the evidence that there is no indication that future medical treatment will be necessary; there is minimal evidence of psychological or emotional problems; there is no permanent disability; the potential problems with scar tissue and disfigurement are minimal because of the location of the injury; past pain and suffering was not particularly great because third-degree burns are less painful than second-degree burns; and future mental anguish must be confined to some embarrassment when Bobby's buttocks are exposed, because he will not remember his ordeal. Defendants then cite numerous cases from other jurisdictions, many ten or more years old, in an effort to enlighten this court regarding what an appropriate and excessive verdict might have been in the case at bar. Defendants suggest that $85,000 is adequate.

Defendants' arguments minimize many of the problems. Bobby still complained of pain at the time of trial. His family testified regarding disciplinary problems and Bobby's fear of

others, including his father. While it is true that the scar will not be visible as he will normally be clothed, it may be visible during swimming and other sports activities, and it is on an area of the body exposed during one's most intimate times. A similar disfigurement of the face would most certainly have been exposed to everyday view; however, we cannot say that because this disfigurement is hidden at most times it is not compensable. Regarding the pain and suffering, there was evidence that Bobby suffered both second- and third-degree burns, and that the second-degree burns are particularly painful because nerve endings are exposed. The photographs of the injuries disclose, to some extent, the extreme seriousness of the burns sustained. The pain suffered during that time must have been excruciating, as described in the evidence. While, as defendants argue, the memory of the events at the age of three months is questionable, there was no evidence that he would not have some kind of memory of what happened to him. It is thus impossible to predict on the basis of the evidence what kind of mental anguish he may sustain in the future. With reference to cases from other jurisdictions where burn or other similar injuries were sustained by children, there are problems with comparing awards from different times and places. We rejected such an approach in evaluating the excessiveness of a jury verdict in *McGuire v. Sifers*, 235 Kan. 368, 373, 681 P.2d 1025 (1984) (quoting *Kirk v. Beachner Construction Co., Inc.*, 214 Kan. 733, 736-37, 522 P.2d 176 [1974]):

"'An examination of the numerous cases challenging the sufficiency, or insufficiency, of a verdict reveals no simple, symmetrical pattern or design. Each case seems to stand on its own facts. We deem it fruitless to attempt a reconciliation of the various amounts which have or have not been held excessive, and we shall undertake no such effort. Perhaps no better explanation can be given for the lack of dollars and cents uniformity in our decisions than is expressed in *Domann v. Pence*, 183 Kan. 135, 325 P.2d 321:

"'". . . Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence. . . ." (p. 141.)

. . . .

" 'The times in which we live are highly inflationary, with constantly climbing prices and a continually shrinking dollar. It is against this sort of a background that we must consider the dictates of conscience.' "

The trial court, when faced with defendants' challenge to the verdict as excessive, observed that some, including the trial judge, might have given less; others might have given more. The members of this court have examined the evidence in this case and the verdict does not shock the conscience of the court. We find nothing in the record to indicate that the verdict returned was a result of passion and prejudice.

The defendants next contend that the trial court erred in denying defendants' motion for a new trial. The issues raised in support of this claim have already been discussed in this opinion. We hold that the trial court did not abuse its discretion in overruling the motion for a new trial.

By way of cross-appeal, the parents contend that the trial court erred in dismissing their claim for their emotional distress resulting from the injury to their minor. Plaintiffs urge reversal of the trial court ruling in light of holdings from other jurisdictions. They rely primarily on the holding in *Dillon v. Legg*, 68 Cal. 2d 728, 69 Cal. Rptr. 72, 441 P.2d 912 (1968), and decisions from other jurisdictions which adopted *Dillon*. We discussed the matter in *Schmeck v. City of Shawnee*, 231 Kan. 588, 594, 647 P.2d 1263 (1982), where we said:

"We hold that a parent has no cause of action for his or her emotional, physical, or other injuries against one who negligently causes injury to an adult child, when the parent is not present at the scene, is not directly injured, and neither witnesses nor perceives the occurrence causing injury to the child."

This rule has equal application where the parents of a minor child claim damages for their emotional distress under like circumstances.

Plaintiffs argue that this case should be distinguished from *Schmeck* in as much as the parents here were just outside the door of the operating room when the tortious conduct occurred. Even if the parents had been in the operating room, it is unlikely they would have realized that the injury was taking place, since it is obvious that neither the physicians nor the nurses there present recognized it. California has rejected a claim that visibility of the results, rather than the visibility of the tortious act, is

the essential element. See *Jansen v. Children's Hospital Medical Center*, 31 Cal. App. 3d 22, 106 Cal. Rptr. 883 (1973), where the court held that the tortious act must be susceptible of understanding observance by the plaintiff. See also *Hair v. County of Monterey*, 45 Cal. App. 3d 538, 119 Cal. Rptr. 639 (1975), where the mother was in the waiting room during the child's surgery and the child suffered serious complications after the surgery which were apparently attributable to some malpractice during surgery. Recovery of damages for the parents' mental distress was denied.

We conclude that this case fits within the rule announced in *Schmeck*, and thus the trial court did not err in dismissing the parents' claim for emotional distress.

The judgment is affirmed.

HOLMES, J., not participating.